Good morning, Your Honors. May it please the Court, Roger Myers on behalf of Provo Craft and Novelty, Inc. I'd like to reserve three minutes for rebuttal, if I may. Your Honors, we're here today on consolidated appeals to present two fairly discrete and separate issues, and I'd like to address both of them. The first of these issues is the District Court's denial of Provo Craft's motion to compel arbitration. In light of the strong federal policy of enforcing agreements to arbitrate between parties, it was error for the District Court Why don't you start with the arbitration clause? With the arbitration clause, yes, Your Honor. The arbitration clause of the agreement is a plenary arbitration clause. No, it's not. It has an exception for a claim of nonpayment. Yes, Your Honor. And a claim of late payment. That's correct, Your Honor. Correct? Okay. So that's accepted from the ambit of the arbitration clause. And the operative complaint, which is the amended complaint, states that your client breached the agreement by failing to pay the royalties and consulting fees when they were due, and the facts were that for a variety of reasons, your client allegedly stopped paying. So it either hasn't paid, or if it pays, has it ultimately paid something, then its payments were late. I guess I don't understand why that isn't the end of the discussion where the operative complaint says nonpayment and the arbitration clause says those claims are not arbitrable. Well, Your Honor, that was our view initially in the case. There were claims for nonpayment, and there was no dispute that ProvoCraft had not made the quarter two payment in 2011 and then thereof. Isn't the district court's decision whether to send the case for arbitration governed by the pleadings and the operative complaint? Well, Your Honor, at the time that, and I think not in this case, Your Honor. Why not? I mean, the plaintiff is the master of his or her complaint. That's kind of hornbook law. And if that's what they want to claim, you didn't pay me, and the arbitration clause says, well, you didn't pay me, is not arbitrable, I guess I'm not sure where you get the district court doing anything other than what it did. Well, at the time that we moved to compel the arbitration, ProvoCraft had made a payment of $490,000. In the same form and manner in each of its prior payments. That was without regard to the party's litigation position. So what? Why isn't the district court required to say what are the claims in the complaint? And if you made those payments, which you did, they were late, and late payments also are not arbitrable. Well, at that point, Your Honor, it resolved the claims for nonpayment and late payment, and it left standing only claims for underpayment. But that isn't in the complaint. There's nothing in the complaint about underpayment. Well, Your Honor, that's part of the difficulty with this case, because it was predicated on a claim of nonpayment. Nevertheless, as the case proceeded, it became so. Wait, wait, wait. As the case proceeded? Well, I think Judge Graber makes a good point. It's over at the beginning, isn't it? I mean, there's a complaint. That's what's alleged. And the judge looks at it and says, okay, fits in category A, or it doesn't fit in the exception, or it doesn't fit in the exception. It's supposed to go, you know, just six months down the road, two years down the road, and say, well, now it's morphing into a different sort of situation. So now I'm going to send it off to arbitration? Is that the way it works? No, Your Honor. I think the problem is that the plaintiff, enough for everyone, conflated two separate claims in its pleadings. There was the issue of nonpayment, but then enough for everyone went much farther than that. And so from the beginning of the agreement through all the time. So you take the position, let me make, maybe I was approaching it from a different point of view, because I was trying to figure out the difference between underpayment and nonpayment, since every nonpayment is an underpayment. It's a complete underpayment, right? If I don't pay anything, I've underpaid. That's correct. But I've not paid. Okay. So do you draw a distinction between a nonpayment and an underpayment? Absolutely, Your Honor. So in other words, if I wanted to get out of the arbitration clause, I was a party I wanted to get out of it or in it, whichever way. I haven't quite figured it out which way, because it's sort of a negative. But all I do is pay a dollar. I say, look, I'm going to pay a dollar. Well, now it's an underpayment. Since it's an underpayment, the guy is going to have to go to court, spend a lot of money litigating it because it's not arbitrable. Do you think really that was the intention of the parties? Is it true that all you have to do is pay a dollar and you take it out of this exception to arbitration? Your Honor, I think that's exactly the position that enough for everyone has taken, is that any underpayment is a nonpayment, and therefore the exclusion governs any claim. And that's rather absurd, isn't it? Yes, Your Honor. So if you had a complaint that was completely different from this amended complaint and it said, we're in a dispute about the amount of the royalties, we think it's 12 cents and our opponent thinks it's 20 cents, that seems to me to be a classic arbitrable claim. But I guess my basic question is, why doesn't the nature of the complaint itself govern the answer to the question of whether this case belongs in arbitration? The first claim for relief is breach of contract, nonpayment. Second claim, breach of the covenant of good faith and fair dealing, nonpayment. Claim three, accounting, nonpayment. So you're right as a theoretical matter, but that's not what this complaint says. And I guess that's my problem with your position. I understand, Your Honor. And we wrestled with that initially. And there was a problem, because you've got really a mixture of two bases for the claims. You've got a nonpayment basis, but you've also got an underpayment basis. And the primary defense to the nonpayment claims was, in fact, a setoff based on overpayment. What essentially ProvoCraft ultimately did was wave the white flag when it came to the nonpayment issue, conceded that those payments had not been made, made the payments and moved to compel arbitration, because what was left at that point was only the issue of underpayment. But that's the structural question I'm trying to get at with you. Whether the decision of the court as to whether a case should be sent to arbitration is governed at the time of the pleadings and is limited by what the initial pleadings say or whether it can morph over time into something else, that's a theoretical structural question, because the complaint, as it's initially drafted, fits within the exception and is properly in court. And so the question is, are there any cases that say, that you're aware of, that as the case develops later on, when the defendant can, you know, moot the claims for nonpayment by paying, can you then force a nonpayment case to become something else later on? I think the answer is yes, Your Honor. In both the Letizia case and the Fisher case from this circuit, the defendant had arbitrated for a considerable period of time, nine months in the Letizia case and three and a half years in the Fisher case. In both of those cases, the court held that there was no preexisting right to compel arbitration prior to the time that the defendant actually sought to compel arbitration. Now, the circumstances were slightly different in those cases. There was a clarification or a change of circuit law that gave rise to the right to compel arbitration. Here, it's essentially a surrender on the nonpayment claims. Have you found any cases where there's an actual change in circumstance that's voluntary on the part of the parties, where they simply pay something to get under arbitration? I'm not prepared to cite one this morning, Your Honor. I'd be happy to do a supplemental brief on that issue if the court would desire. If the court has no further questions about arbitration, I'd like to turn to the other prong of our appeal, the accounting. The order of reference to the special master is the source and the limit of the special master's authority and power. Here, the order of reference instructed the special master to conduct whatever proceedings and make the factual findings and legal conclusions necessary to conduct an accounting. Now, those legal conclusions and factual findings in this case amounted to what products, what rates, what was the net sales price, so how do we calculate the payments that are due, what was the cost, and what payments have been made. That was essentially what was before the special master. Instead, the special master went far astray from the order of reference and conducted a completely different type of proceeding. I'll focus on three different ways in which he did so. The first is he made very prejudicial, extrinsic evidence the centerpiece of his analysis, and the court adopted the special master's report and recommendation wholesale. So this court is actually reviewing the special master's report and recommendation. Primarily, I'm speaking here of what was known as the chase email. Now, enough for everyone has said that intent is relevant in a contract case, and that's true to a certain extent. The intent of the contracting parties is relevant. It's absolutely relevant to what the contract requires. But we don't find that intent in an email written three years down the road. We find it first within the text of the agreement itself, and then if there is ambiguity in that agreement, we look to extrinsic evidence that may be capable of informing whatever those ambiguities are. And here there were a couple of ambiguities that had to be resolved. What products were involved? There was a question about the schedules. What does the term credits mean? Because there was a deduction for credits and returns. And what does the term cost mean? Because there were sales below cost provisions that removed the obligation to pay any royalties for sales below cost. The chase email has nothing to do with any of those topics. And it wasn't offered for those reasons. The briefing that enough for everyone submitted to the special master made that very clear. They said the chase email shows that ProvoCraft's overpayment defense was fabricated and pretextual in furtherance of a wrongful scheme to stop the royalty payments. And we objected many, many times to the use of this chase email in this fashion, but it was allowed. And when you look at the accounting report and recommendation, there's about four pages of analysis in a roughly 13-page report and recommendation dedicated to the chase email or to a couple of emails like that. And the special master referred to other emails saying things such as, these emails give a good insight into the corporate mindset of ProvoCraft. They reveal a conscious effort. To not pay the royalties. To not pay the royalties, Your Honor. And frankly, none of that's relevant. The reason that ProvoCraft stopped paying has nothing to do with an accounting under the contract to see what to do. It's just a question of what does the agreement require and then what do we do about it. What the special master did with these emails is he used them to ignore significant provisions of the agreement. Things that are in black and white in the agreement. The sales below cost provision is a clear example. And it wasn't just the chase emails. He also used a lot of course performance evidence as the backbone for some of this analysis. But the agreement carves out sales below cost and says, no royalties and no consulting fees will be due on products that were sold below cost. And it's a little bit more specific than that. This was a big focus of the party's dispute at the accounting proceeding. Obviously with the types of products, the infomercial products, there was a great deal of discussion of what costs could be included. But even if we set those aside, there was no dispute that at the most basic level, the cost that Provo Craft paid to obtain the products that it was selling was the most conservative and most reasonable measure of cost that could be used. Counsel, you're down below two minutes if you wanted to save any time for rebuttal. I will, Your Honor. Thank you. We'll hear from Mr. Russ. Good morning, please. Mr. Court, Ronald Russ on behalf of, not for everyone in the upper league. I would just ask the Court if the Court has any specific questions of me rather than to side with you. On the arbitrability question, I gave your opponent a hard time, but I'm going to give you a little bit of a hard time, too. Because it seems to me that it's also, in addition to the principles I discussed with him, it's also true that parties can try additional issues by agreement as the case proceeds. It is not uncommon to see something come up and get tried that isn't strictly within the words of the pleadings. And it seems to me that there is a difference between underpayment and nonpayment. To use my example again, people differ whether they owe 12 cents or 20 cents per item as the amount of royalties. That would seem to be classically something that would go to arbitration under this agreement. And so my question to you is twofold. Theoretically, can a case morph in the way that we've been discussing so that a non-arbitrable claim becomes arbitrable? And if so, why didn't that happen here? I guess I can imagine theoretically the notion of a case morphing. But then I think under the facts of this case is where you get to a discussion about waiver. Whereas here, the question as to nonpayment or underpayment was completely within the control of ProvoCraft. And I wrote, I kind of smiled, ProvoCraft could have paid $1 and said it's an underpayment. What ProvoCraft did is it participated at every step and availed itself of the procedures in the district court. It got its early disclosures under Rule 26. It attended scheduling conferences. It agreed to an accounting by the special master. It agreed and stipulated to what the special master would do and how he would do it. It asked the court when the court, quite frankly, had bristled, and I'll say at the parties, though I think it was at one party, for having failed to abide by discovery orders, that it was going to take the accounting away from the special master. Two different lawyers in two different times on behalf of ProvoCraft asked the court, please don't do that. Please don't advance the case for trial before your Honor. Please allow it to stay with the special master. We are ready for the special master. It availed itself of the provisions. Breyer. So it got all the benefits. Right. I understand that. Another thing that concerns me is if you defend it doesn't pay. Allegedly doesn't pay. Oh, these are allegations. Allegedly doesn't pay what was owed. So the plaintiff sues. And it's assigned before Judge Breyer. And the plaintiff knows if there's one thing that the plaintiff doesn't want is to have Judge Breyer decide this case. I can understand that. Generally half the people feel that way. Maybe not at the beginning, but at the end. So anyway, he then pays a dollar or $5 or $1,000 or 50,000, I don't know, whatever it is. Then it becomes an underpayment case. Well, I was going with the question here. I don't see a distinction between nonpayment and underpayment. I think, as Judge Carter noted, that's a water into wine sort of an argument. Well, assume that we disagree with you on that. It seems to me, or at least I shouldn't say we as to any of this. What if your complaint at the outset had said the parties disagree on the amount of the royalty? We think they owe us $0.20 per item. They've paid us $0.12 per item. And we need somebody to decide this intensive factual question about how the royalties are to be calculated. Why wouldn't that have been an arbitrable claim? That's not your claim, but why wouldn't that hypothetical claim for relief have been arbitrable under this agreement? I have to be honest with you. I haven't thought of it that way because those are not the facts. I know that. That's why it's a hypothetical. I would think that had those been the facts and had those facts been alleged in the complaint, Provo Craft would have either brought its motion to compel arbitration making the argument at that point, or it would have continued down the same road it did and then had a very difficult time saying that there was underpayment after it had been 10 months in litigation and on the eve of trial. In this case, the facts were they didn't make the payment. They can't do it. Period. If you think about the notion of underpayment, their affirmative defense of overpayment was an affirmative defense that arose, I think, about 6 months after they stopped making the payments and for the first time as an affirmative defense after having gone through motion practice with 12B6 motions and motions for more definite statement. And then that defense came up. So I haven't really thought about had we had a different set of facts. So I guess theoretically we'd get through it. But had we had that different set of facts, I am sure that there would be a different argument here today because there would be no excuse for having not brought the motion to compel in the first instance. Right, which is, I guess, somewhat roundabout agreeing with my premise, which is that there are some things about payment or the amount of payment that could be arbitrable. And what I'm struggling with is whether the case was so altered by the time of the motion that it became arbitrable. Of course, the motion was filed before the payment was made. Correct. And was not renewed after the payment was made. And so at the time the district court acted, there was still no payment. There was still no payment. There was a promise to act in the future, which is, I think, what Judge Carter addressed. So that was the ruling that is being appealed. There had been no payment. And as we stand here today, there haven't been payments that have been made. But that's for a different day. Would you address the order of reference to the special master portion of the appeal as well? Well, the stipulation for reference to the special master was put together by the parties and stipulated to by the parties. And the parties specifically stipulated that any and all factual findings and legal conclusions necessary could be found by the special master. The parties also stipulated that the special master could act as a discovery referee. And there were a variety of motions to compel. And I will note, and the things that I'm arguing, in fact, are in the record. There are citations in our brief to the record, and the evidence is presented, and I'll note the argument on the other side. There is no citation to evidence. And there was very little evidence that was submitted in support of the motions that we're talking about. Actually, none with respect to the motion to compel arbitration below. The day before the trial, there were 90,000 pages of documents that were finally produced. And this is in the record, and we've cited that. And I could describe what I think is gamemanship to it. But certain things did come out of those. And some of those documents, the e-mails, are the very e-mails that Judge Smith noted showed, in his view, in the testimony that was presented, that it was concocted, that we are not going to pay this woman, I'm sorry, enough for everyone, which is wholly owned by Desiree Tanner. We will take her to court and we will string her out. And that is the clear flavor. That was in defense of the overpayment affirmative defense, for which there was no evidence submitted in support of, just argument. So it seems to me that when the parties stipulated and crafted the order that said any and all factual findings and legal conclusions necessary to adjudicate the claims, that included adjudicating the affirmative defense of overpayment, which interestingly enough, the testimony presented, and this is in the compendium of evidence that we have submitted in the supplemental record, the deposition of the people who had always been in charge of making these calculations before, weren't even consulted for the trial. They weren't even consulted for the overpayment defense. The overpayment defense was wholly concocted by the general counsel. But that was the testimony. I was trying to address the notion of what it was that Judge Smith needed to look at and what it is the parties agreed that he could look at. If the Court has no further questions, I will rest my case. I have no further questions. Thank you. And Mr. Myers has some rebuttal time remaining. Thank you, Your Honors. I would just like to clear up a couple of points from Mr. Russ's argument. First, I don't believe that there was a 12B6 motion filed in this case, and I believe that I heard him say that there was. That's significant because when one of the allegations is prejudice and ProvoCraft participating in the proceedings, I think it's important that we have a clear record of what ProvoCraft did or did not do. Judge Breyer, you asked a question about what if a payment of $1 or $5 or some level of money had been made, and Judge Graber, you asked a similar question. I think the heart of that question goes to is there sort of a collusive payment intended to strip the district court of jurisdiction or act in the terms of forum shopping. And under the facts here, it clearly isn't. This was a $490-some-thousand payment. It was a complete payment of all of the alleged nonpayments and left only the underpayments. In terms of the participation of ProvoCraft in these proceedings, without question, there were nonpayment allegations. But there were mixed claims, really, in the complaint. There were claims that were denoted for nonpayment, but if you read through them, enough for everyone asks for an accounting estimate. Let's go back to Judge Graber's very first question, which was looking at the complaint as it was written and the decision that the trial judge had to make. That was put in terms of a nonpayment, right? I disagree, Your Honor. There was a heading underneath count one, for example, that said nonpayment. But if you actually look at the paragraphs of the allegation, it's clear that enough for everyone is seeking not just that quarter two 2011 payment, but they're looking to go back for prior underpayments. What wasn't clear at that time was that that was the essence of the entire complaint. It looked like a nonpayment complaint. But when we asked in discovery, what do you believe has not been paid? Well, that raises the other question, which is how far down the road do you have to go in a complaint or in the litigation process to determine what is the genuine nature of what is really being said hereafter, since the complaint improperly stated it was nonpayment when it was an underpayment? How far down do you have to go in discovery to make a determination as to whether or not it's arbitrable? And if it is arbitrable, my understanding of arbitration is that you don't have discovery or discovery can be agreed upon by the parties, but depending on the rules and so forth. So are we supposed to measure the degree of prejudice that was suffered in any given case to determine at what point the arbitration clause kicks in? Your Honor, I don't believe that there was prejudice here at all. But on the facts of this case, certainly not, because there was a clearly non-arbitrable claim. There was discovery? Yes, Your Honor. In fact, ProvoCraft bore almost the entire burden of that discovery. Enough for everyone to prove its claims, its underpayment claims, certainly was worth a higher tax point. But there isn't discovery in arbitration, is there? I believe under the rules specified in this agreement, there would have been at least some discovery, Your Honor. Okay. Thank you, counsel. Thank you, Your Honor. The case just argued is submitted, and we appreciate the arguments of both counsel. They've been very helpful.
judges: Breyer, Kozinski, Graber